IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
     Plaintiff,

v.                               Case No.: 3:10cv379/MCR/EMT

TITAN WASTE SERVICES, INC.,
     Defendant.
_____/

## ORDER, REPORT AND RECOMMENDATION

     This matter has been referred to the undersigned by the district court for all pretrial proceedings, including the issuance of preliminary orders, conduct of necessary hearings, and—with respect to any dispositive matters—the filing of a report and recommendation containing proposed findings of fact and conclusions of law (*see* doc. 71). *See also* N.D. Fla. Loc. R. 72.3; 28 U.S.C. § 636(b)(1)(B)(C), and Fed. R. Civ. P. 72(b). Default has been entered against Defendant Titan Waste Services, Inc. ("Titan" or "Defendant") (*see* docs. 71, 72). The case is now before this court on the motion for default judgment pursuant to Fed. R. Civ. P. 55(b)(2), filed by Plaintiff Equal Employment Opportunity Commission ("Plaintiff") (doc. 73). Defendant has not responded. For the reasons set forth below, the court recommends that Plaintiff's motion be granted and that default judgment be entered against Defendant in the amount of $228,603.75.[1]

## I.     PROCEDURAL HISTORY

     Plaintiff commenced this action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 on September 30, 2010 (doc. 1), for the stated purpose of correcting unlawful employment practices on the basis of race and to provide appropriate relief to Michael Brooks ("Brooks"), a former employee of Defendant, who Plaintiff alleged was adversely affected

---

[1] Also pending is Plaintiff's motion to stay the litigation due to the government shut-down that commenced October 2, 2013 (doc. 80). The court shall deny this motion as moot.

by such practices (*id.* at 1). According to the allegations of the first amended complaint (doc. 4), Defendant subjected Brooks to discrimination in the form of disparate treatment in the terms and conditions of employment, racial harassment, and discharge from employment because of race (*id.* at 3). As relief, Plaintiff asked the court to permanently enjoin Defendant from engaging in discrimination based on race; order Defendant to institute and administer policies, practices, and programs which provide equal employment opportunities for black employees and eradicate the effects of past and present unlawful employment practices; order Defendant to make Brooks whole by compensating him for past and future pecuniary and non-pecuniary losses resulting from the complained-of unlawful employment practices; order Defendant to pay Brooks punitive damages; grant such further relief as deemed necessary and proper in the public interest; and award Plaintiff its costs (*id.* at 5–6).

Defendant filed an answer and affirmative defenses (doc. 10), following which the district court entered scheduling orders (docs. 11, 48). Mediation ended in an impasse (doc. 61). On May 28, 2013, the district court granted the motion to withdraw as attorney of record filed by Defendant's then-counsel, and it gave Defendant thirty days in which to retain new counsel; the district court cautioned Defendant that the failure to hire new counsel would subject it to the entry of a default judgment (doc. 69). On July 1, 2013, with no counsel having appeared on Defendant's behalf, the district court directed the clerk to enter a default against Defendant for the failure to retain counsel as ordered, and it authorized Plaintiff to file a motion for default judgment (doc. 71). The district court further directed that when the motion for default judgment was filed, the motion should be referred to the undersigned for action. The clerk entered a default against Defendant (doc. 72), and referred the matter to the undersigned after Plaintiff filed a motion for default judgment (doc. 73). In response to this court's order requiring further information (doc. 75), Plaintiff filed a supplemental memorandum and a declaration in support of its motion for default judgment (docs. 76, 77). Defendant, still unrepresented by counsel, did not respond.

On August 13, 2013—or more than six weeks after the deadline imposed by the district court for new counsel to appear for Defendant—attorney J. Rod Cameron made an appearance in the case on behalf of Defendant (doc. 78). Counsel offered no reason for his late appearance and did not

attempt to respond to Plaintiff's pending motion for default judgment.  On October 3, 2013,[2] the court gave Defendant through October 15, 2013, in which to file a motion for leave to file an untimely response to the motion for default judgment, to be accompanied by a memorandum in support and a proposed response to the motion for default judgment (doc. 83).  That time elapsed without Defendant's filing a response.  On October 18, 2013, this court issued an order to Defendant to show cause, within fourteen days, why the court should not proceed with entering a default judgment in favor of Plaintiff (doc. 84).  Again, Defendant did not respond, and to date it has not responded or otherwise attempted to communicate with the court.

## II.    FACTUAL ALLEGATIONS

### Amended Complaint

Plaintiff alleges in the amended complaint that Defendant subjected Brooks, who is black (doc. 4, ¶ 9), to the use of racial slurs and racially derogatory insults and language, including the use of the "N" word, by the highest level manager at the waste disposal facility at which Brooks worked (*id.*, ¶ 10).  The harassment was unwelcome to Brooks and occurred with the full knowledge of Defendant's supervisory personnel, who failed to prevent or promptly correct the racially harassing behavior (*id.*, ¶ 11).  Throughout the course of Brooks' employment, Defendant treated Brooks differently with respect to uniforms, assignments, and pay than it did similarly situated white employees, including white drivers (*id.*, ¶ 12–15).  Defendant did not provide uniforms to Brooks and the only other black employee (a helper) although it did so for its white employees (*id.*, ¶ 13). For a period of time, Defendant compensated white drivers more than it compensated Brooks, the sole black driver it employed (*id.*, ¶ 15).  Also, Defendant assigned white drivers more favorable routes than it assigned Brooks (*id.*, ¶ 14).  Defendant required Brooks to perform more degrading, burdensome, and unsafe assignments than white drivers and gave Brooks less support in the performance of his duties than it gave white drivers (*id.*).  Additionally, Defendant often permitted white drivers to use the vehicle normally assigned to Brooks, which  prevented Brooks from working and caused him to lose pay (*id.*).  On or about October 30, 2008, Defendant terminated

---

[2]  The notice of appearance of counsel was not referred to chambers, and thus the undersigned was not made aware of the appearance at the time the notice was filed.

Brooks' employment (doc. 4, ¶ 16). Brooks was the only driver terminated at that time and was not terminated for cause (*id.*).

<u>Brooks' Declarations</u>

In Brooks' declaration dated July 3, 2013 (doc. 73-1), Plaintiff augments the facts alleged in the amended complaint with the following facts. Defendant employed Brooks as a truck driver from August 19, 2007, until it permanently laid him off on or about October 31, 2008 (*id.*, ¶ 1). During the course of Brooks' fourteen months of employment, Brooks' supervisor, Larry Pellegrino ("Pellegrino"), openly made racial comments to Brooks in the workplace, referring to him as "boy," "nigger," "fucking nigger," and "lazy nigger" (*id.*, ¶¶ 2–3). Pellegrino also stated to Brooks that "all niggers steal"; additionally, when there was a problem with the company truck that Brooks drove Pellegrino would say in Brooks' presence that "it was the nigger's fault" (*id.*, ¶ 3).

Brooks and the only other black employee were not provided company T-shirts or given gift cards at Christmas, although white employees were (doc. 73-1, ¶ 5). Brooks would often arrive at work to find that the truck assigned to him had been reassigned to a white employee. When that occurred, Brooks was sent home for the day without pay. Pellegrino did not treat white employees in the same manner (*id.*, ¶ 6). When Brooks missed a stop on his route on one occasion, Pellegrino fined him the fuel cost for a return trip; white employees who missed stops were not fined, however (*id.*, ¶ 7). On October 29, 2008, Pellegrino asked Brooks, "If Obama wins [the presidential election] will he give you a job?" Beginning on October 31, 2008, Pellegrino directed Brooks to call in each day to see if there was work available for him (*id.*, ¶ 8). Brooks did as directed but was not given any subsequent work assignments (*id.*). After about one week, Pellegrino informed Brooks that he was permanently laid off (*id.*).

In his supplemental declaration, dated August 6, 2013, Brooks states that the racial comments, racially harassing behavior, and discriminatory terms and conditions of employment to which he was subjected while employed by Defendant and the termination of his employment affected him deeply in numerous ways (doc. 77-1, ¶ 2). Brooks states that he felt belittled as a human being and dehumanized; he was also embarrassed that his fellow employees witnessed the discrimination and harassment and knew he was tolerating it (*id.*, ¶ 3). This made him feel like less of a man (*id.*). Sometimes at night, at home, Brooks would recall the discrimination and harassment

he had experienced that day and start to cry (*id.*, ¶ 4). He had never before in his life experienced such treatment (*id.*). While he worked at Titan, Brooks felt upset every day and sometimes angry because Pellegrino was being disrespectful and stereotyping him due to the color of his skin (*id.*). Brooks felt he was being treated like a slave (*id.*, ¶ 6). The discrimination and harassment Brooks experienced at Titan started his first day of work and continued throughout his employment there (*id.*, ¶ 7). He feared he might be fired at any time (*id.*). When Pellegrino would send him home without pay so that a white driver could use the truck usually used by Brooks—something which occurred often—Brooks worried about whether he would be able to pay his bills (*id.*). The worry also caused him to be unable to sleep at night (*id.*, ¶ 8). Brooks would often wake up at night thinking about the harassing, racial statements Pellegrino had made that day (*id.*, ¶ 9). Brooks felt nervous and stressed every day that he worked at Titan. He eventually tried to avoid talking to Pellegrino (*id.*, ¶ 10). When Brooks would go home at night, he would feel depressed and sad; he lived by himself at that time and did not want to be with other people (*id.*, ¶ 11). Brooks was separated from his wife while working for Titan. Brooks' embarrassment, anger, worry, and depression negatively affected his relationship with his wife, causing problems in their relationship (*id.*, ¶ 12). The pay discrimination Brooks suffered also impacted his ability to pay court-ordered child support (*id.*). After his employment with Titan was terminated, Brooks remained nervous, stressed, and depressed (*id.*, ¶13). His impaired ability to pay child support caused him additional stress and distress (*id.*). Brooks also lost his personal vehicle, a truck, at this time. The truck needed repairs that Brooks was unable to afford, and he was too distressed about his situation to even call the repair shop that was holding the truck; eventually the shop sold the truck (*id.*). For approximately one year prior to Brooks' employment at Titan and also during the time he was employed by Titan, Brooks lived in a hotel while separated from his wife. After his employment was terminated and his small savings were exhausted, Brooks was homeless for about two weeks, until his wife permitted him to return home (*id.*, ¶ 14). Concluding, Brooks states that the termination of his employment—which resulted in the loss of income, loss of his truck, and homelessness for two weeks—caused him a great deal of worry, stress, sadness, and depression (*id.*, ¶ 15).

## III.    APPLICABLE LAW

Federal Rule of Civil Procedure 55 sets out a two-step procedure for obtaining a default judgment.  First, when a defendant fails to plead or otherwise defend the lawsuit, the clerk of court is authorized to enter a clerk's default.  Fed. R. Civ. P. 55(a).  Second, after entry of the clerk's default, if the defendant is not an infant or an incompetent person, the court may enter a default judgment against the defendant for not appearing or defending.   Fed. R. Civ. P. 55(b)(2).

After a default has been entered pursuant to Rule 55(a), in order to determine whether the moving party is entitled to default judgment pursuant to Rule 55(b) the court must review the sufficiency of the complaint and its underlying substantive merits. 10 James Wm. Moore et al., Moore's Federal Practice § 55.20[2][b] (3d ed. 2007); Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1370 n.41 (11th Cir. 1997).  In defaulting, a defendant "admit[s] the plaintiff's well-pleaded allegations of fact" for purposes of liability.  Buchanan v. Bowman, 820 F.2d 359, 361 (11th Cir. 1987).  In addition to the pleadings, a court may consider evidence presented in the form of an affidavit or declaration.  Antoine v. Atlas Turner, Inc., 66 F.3d 105, 111 (6th Cir. 1995) ("Use of affidavits in granting default judgments does not violate . . . due process"); Frazier v. Absolute Collection Service, Inc., 767 F. Supp. 2d 1354, 1362 (N.D. Ga. 2011) (on motion for default judgment, adopting Report and Recommendation which considered declaration testimony, well-pleaded allegations in complaint, and reasonable inferences from such allegations to determine whether Plaintiff stated claims for relief); Super Stop No. 701, Inc. v. BP Prods. N. Am. Inc., No. 08–cv–61389, 2009 WL 5068532, at *2 n.4 (S.D. Fla. Dec. 17, 2009) (noting that in default judgment proceedings unchallenged affidavits are routinely used to establish liability and damages).

If the facts alleged in the complaint are sufficient to establish liability, the court must then conduct an inquiry to ascertain the amount of damages.  Arista Records, Inc. v. Beker Enter., Inc., 298 F. Supp. 2d 1310, 1312 (S.D. Fla. 2003).  An evidentiary hearing may be required to determine the amount of damages; however, where the record is sufficient, a court may be able to determine damages without a hearing.  See Sec. & Exch. Comm'n v. Smyth, 420 F.3d 1225, 1231, 1232 n.13 (11th Cir. 2005) (stating that no hearing is necessary "when the district court already has a wealth of evidence from the party requesting the hearing, such that any additional evidence would be truly unnecessary to a fully informed determination of damages"); Adolph Coors Co. v. Movement

Against Racism and The Klan, 777 F.2d 1538, 1544 (11th Cir. 1985). In other words, although a defaulted party is deemed to have admitted well-pleaded allegations of liability, allegations relating to the amount of damages are not admitted by virtue of default. *See* Smith v. Noso, Inc., No. 6:06cv1123/Orl/28KRS, 2007 WL 2254531, at *2 (M.D. Fla. Aug. 3, 2007). Thus even in the default judgment context "[a] court has an obligation to assure that there is a legitimate basis for any damage award it enters." Anheuser Busch, Inc. v. Philpot, 317 F.3d 1264, 1266 (11th Cir. 2003).

## IV. DISCUSSION

Following Mr. Cameron's appearance on August 13, 2013, this court gave Defendant two opportunities to respond to Plaintiff's motion for default judgment (docs. 83, 84), including the order to show cause why the court should not proceed with entering a default judgment in favor of Plaintiff (doc. 84). Defendant completely ignored both orders. Although the district court originally directed entry of default based on Defendant's failure to obtain substitute counsel—a situation which no longer exists due to the late appearance of Mr. Cameron—the default remains properly in place due to Defendant's failure to defend, which continues to this date. Moreover, entry of default judgment for the failure to defend is likewise warranted. Although in the Eleventh Circuit default judgments are viewed with disfavor due to a strong policy of determining cases on their merits, *see* In re Worldwide Web Sys., Inc., 328 F.3d 1291, 1295 (11th Cir. 2003), a "district court has the authority to enter default judgment for failure to prosecute with reasonable diligence or to comply with its orders or rules of procedure." Wahl v. McIver, 773 F.2d 1169, 1174 (11th Cir. 1985) (citations omitted). Based on Defendant's utter disregard of the court's two most recent orders and its failure to otherwise communicate with the court, much less respond to the pending motion for default judgment, the sanction of default judgment is appropriate. Given the circumstances just described, the court is left with the conclusion that no lesser sanction than default judgment is available or will suffice. The court therefore proceeds with the two-step default judgment analysis.[3]

---

[3] In so proceeding, as part of the sanction imposed against Defendant the court strikes and does not consider Defendant's answer and affirmative defenses (doc. 10). *See* Carhart v. Gulfstream Homes, Inc., Case No. 2:08cv-224-FtM-29SPC, 2010 WL 427557, at *1 (M.D. Fla. Feb. 1, 2010) (sua sponte striking answer and affirmative defenses prior to addressing motion for default judgment);

**Liability**

In assessing Title VII claims, courts generally follow a three-part, burden-shifting analysis. *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). As this case is proceeding on a motion for default judgment, however, Plaintiff need only make out a prima facie case because Defendant cannot overcome any burden that would shift to it. For the reasons given below, the court concludes that the allegations in the amended complaint, taken along with the allegations in Brooks' declarations, are sufficient to establish the elements of a prima facie case with respect to Plaintiff's claims for racial harassment, discriminatory discharge, and disparate treatment in the terms and conditions of employment.

Racial Harassment

Racial harassment is actionable under Title VII where the conduct is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *See, e.g.*, Freeman v. City of Riverdale, 330 F. App'x 863, 865 (11th Cir. 2009). To establish a prima facie case of hostile work environment in the form of racial harassment, Plaintiff must show that (1) Brooks belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a racially abusive work environment; and (5) a basis exists for holding the employer liable. *See* Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002); *see also* Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).

That the first three elements of the prima facie case have been adequately alleged here is readily apparent: Plaintiff asserts that Brooks is black and thus belongs to a protected class; that he was subjected to unwelcome harassment; and that the harassment was based on his race.

As to the fourth element, to evaluate the objective severity of the alleged harassment, the court should consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Miller, 277 F.3d at 1276 (citing Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997)). No single factor is dispositive; the evaluation must take into consideration the "totality of the circumstances." *Id.* In this case,

Plaintiff alleges that the Pellegrino's harassment—including his repeated use of racial insults and the word "nigger" spoken directly to Brooks or made in his presence—was severe and occurred frequently over the entire course of Brooks' fourteen-month employment.[4]  Brooks also states that the conduct was humiliating and demeaning to him.  "[R]epeated incidents of verbal harassment . . . are indicative of a hostile work environment."  *Id.* (ethnic slurs directed at plaintiff three to four times daily is severe and pervasive); *see also* Nichols v. Volunteers of America, North Alabama, Inc., 470 F. App'x 757, 761 (11th Cir. 2012) (finding evidence that plaintiff encountered racially hostile behavior and language at work "on a daily basis" sufficient to create an issue of fact about whether harassment was severe or pervasive); E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1068–69 n.3 (11th Cir. 1990) (indicating that supervisor's racist slurs, including "niggers," "ignorant niggers," and "swahilis," and his statements that "blacks were meant to be slaves" and were of lower intelligence, and "[t]hose niggers out there will not get anywhere in this company" created racially hostile work environment); Walker v. Ford Motor Co., 684 F.2d 1355, 1359 (11th Cir. 1982) (affirming trial court finding of severe and pervasive discrimination where plaintiff was target of "repeated," "continuous," and "prolonged" racial slurs).  Plaintiff does not explain how Pellegrino's conduct unreasonably interfered with Brooks' job performance, perhaps other than suggesting that it caused Brooks to try to avoid talking with Pellegrino, who was his supervisor, and kept Brooks from sleeping.  Nevertheless, Eleventh Circuit precedent mandates that courts consider "the totality of the circumstances" such that the absence of one factor (i.e., unreasonable interference) is not dispositive.  *See, e.g.*, Miller, 277 F.3d at 1277 (finding that a failure by an employee to show how harassing conduct unreasonably interfered with the employee's work performance did not necessarily constitute a failure to satisfy the objectiveness prong).  The Supreme Court has also cautioned that harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).  Therefore, in this case, the court is satisfied that "having established

---

[4]  "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates."  Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993) (citations and internal quotation marks omitted).

the frequency, severity, and humiliating nature of the conduct, [Plaintiff's] failure to establish convincingly how [Pellegrino's] conduct interfered with [Brooks'] duties is not fatal to his hostile environment claim, given the totality of the circumstances." Miller, 277 F.3d at 1277. In short, this court concludes that with respect to the fourth element, Plaintiff's allegations are sufficient to show that the harassment was severe enough to alter the terms and conditions of Brooks' employment and create a discriminatorily abusive work environment.

Plaintiff's allegations are also sufficient with respect to the fifth element of a hostile work environment claims, that is, employer liability. An employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Miller, 277 F.3d at 1278 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292–93, 141 L. Ed. 2d 662 (1998)). "The employer will be strictly liable for the hostile environment if the supervisor takes tangible employment action against the victim." Id. (citing Faragher, 524 U.S. at 807). In this case, the facts alleged show that Pellegrino's harassment of Brooks culminated in a tangible employment action: Pellegrino's informing Brooks in approximately early November 2008 that he was permanently laid off or, in other words, that his employment was terminated.

For the foregoing reasons, the court concludes that Plaintiff has satisfactorily alleged a prima facie case of hostile work environment in the form of racial harassment.

Disparate Treatment: Termination of Employment

To establish a prima facie case of disparate treatment—here, based on discriminatory discharge—a plaintiff must show (1) that he is a member of a protected class; (2) that he was qualified for his position; (3) that he was subjected to an adverse employment action, and (4) that his employer treated "similarly situated" employees outside his class more favorably. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

In this case, as noted previously, Plaintiff has adequately alleged that Brooks is a member of a protected class—black—and suffered an adverse employment action—the termination of his employment. Although Plaintiff has not specifically alleged that Brooks was qualified to perform his position as truck driver for a waste disposal company, "in termination cases, the question of whether the plaintiff was qualified to do the job is not often at issue. In cases where a plaintiff has

held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred."  <u>Crapp v. City of Miami Beach</u>, 242 F.3d 1017, 1020 (11th Cir. 2001) (citation and internal quotation marks omitted).  The court concludes that Brooks' statement that he worked as a truck driver for Titan for approximately fourteen months is sufficient to satisfy the "qualified" prong of a prima facie case of discriminatory discharge.

As to fourth element, Plaintiff asserts that in late October/early November 2008 Pellegrino terminated without cause the employment of Brooks—Defendant's only black truck driver—but did not terminate the employment of any of Defendant's white truck drivers, thus treating the similarly situated white employees more favorably.  This element, therefore, is also adequately alleged.  Even if the court concluded this element was not sufficiently pled, Plaintiff may demonstrate a prima facie case of discriminatory discharge by establishing "facts adequate to permit an inference of discrimination."  <i>See</i> <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1185 (11th Cir. 1984) (the prima facie case method was "never intended to be rigid, mechanistic, or ritualistic") (citations omitted); <i>see also</i> <u>Schoenfeld v. Babbitt</u>, 168 F.3d 1257, 1268 (11th Cir. 1999) (a "prima facie case of disparate treatment can be established by any proof of actions taken by the employer from which we infer discriminatory animus . . . .").  Thus Plaintiff may raise the inference of discrimination other than by showing that a similarly situated individual from outside the protected class was treated differently.  <i>See, e.g.</i>, <u>Howard v. Roadway Exp., Inc.</u>, 726 F.2d 1529, 1534 (11th Cir. 1984) (rejecting the argument that black plaintiff could not establish prima facie case of discriminatory discharge because she was replaced by another black person); <i>see also</i> <u>Watkins v. Sverdrup Tech., Inc.</u>, 153 F.3d 1308, 1314 (11th Cir. 1998) (in discriminatory discharge based on age, plaintiff need not establish that employer replaced plaintiff with a younger employee; rather, it is sufficient that plaintiff produce "evidence by which a fact finder reasonably could conclude that the employer intended to discriminate on the basis of age in reaching [the termination] decision").  Here, the facts alleged—in particular, that for the fourteen-month term of Brooks' employment Pellegrino racially harassed Brooks through the repeated use of humiliating racial slurs and insults (and to a lesser extent that Pellegrino made an arguably racially-based statement to Brooks concerning the 2008 presidential election on October 29, 2008, shortly prior to Pellegrino's effective

termination of Brooks' employment)—are sufficient to permit drawing the inference that the termination was motivated by racial animus.

For these reasons, the court concludes that Plaintiff has satisfactorily alleged a prima facie case of discriminatory discharge.

Disparate Treatment: Terms and Conditions of Employment

As noted previously, to establish a prima facie case of disparate treatment, the plaintiff must show that (1) that he is a member of a protected class; (2) that he was qualified for his position; (3) that he was subjected to an adverse employment action, and (4) that his employer treated "similarly situated" employees outside his class more favorably. Holifield, 115 F.3d at 1562; Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). Plaintiff alleges that Brooks was subjected to disparate treatment concerning the terms and conditions of his employment at Titan.

The court has previously concluded that the first two elements of this prima facie case have been satisfied. As to the third element, that is, the adverse employment action to which Brooks was subjected, Plaintiff alleges that this was—as in the discriminatory discharge claim—the termination of Brooks' employment without cause. With respect to the fourth element, that is, that Defendant treated white employees differently than it treated Brooks, Plaintiff asserts that Defendant provided uniforms for its white employees but did not do so for Brooks or the only other black employee; assigned white drivers more favorable routes than it assigned Brooks; required Brooks to perform more degrading, burdensome, and unsafe assignments than white drivers; permitted white drivers to use Brooks' work vehicle, which prevented him from working and caused him to lose pay; and for a time compensated white drivers more than it compensated Brooks (doc. 76 at 9).

The Eleventh Circuit's standard for discrimination claims requires an employee to establish an "ultimate employment decision" or make some other showing of substantiality in the employment context in order to establish an adverse employment action. See Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (citing Stavropoulos v. Firestone, 361 F.3d 610, 616–17 (11th Cir. 2004); Gupta v. Florida Board of Regents, 212 F.3d 571, 587 (11th Cir. 2000); Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001)). Ultimate employment decisions may include "termination, failure to hire, or demotion." Stavropoulos, 361 F.3d at 617. Conduct falling short of an ultimate employment decision must, in some substantial way, "alter[ ] the employee's

compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect [ ] his or her status as an employee." Gupta, 212 F.3d at 587 (quotation and citation omitted). The level of substantiality required for a Title VII discrimination claim requires an employee to demonstrate he suffered "a serious and material change in the terms, conditions, or privileges of employment" in order to demonstrate an adverse employment action. Davis, 245 F.3d at 1239.

While the court has concluded that the termination of Brooks' employment satisfies the adverse employment action requirement in connection with his discriminatory discharge claim, it cannot reach the same conclusion in connection with the claim that Brooks was subjected to disparate treatment in the terms and conditions of his employment. The two claims are distinct and implicate distinct adverse employment actions.

The allegations that Defendant failed to provide uniforms, failed to assign more favorable routes to Brooks, and gave Brooks less favorable work assignments are enough to show that Brooks was treated less favorably than his white co-workers, thus meeting the fourth element of this disparate treatment claim. The allegations do not, however, suggest Brooks suffered "changes" to the terms or conditions of his employment, much less "serious and material" ones, as required by the third element. At least arguably, however, preventing Brooks from working by reassigning to other drivers the truck he regularly used and "for a period of time" paying him less than other drivers are actions substantial enough to show that Brooks suffered serious and material changes in the terms or conditions of his employment. Viewed in that light, the conduct involves adverse employment actions. Davis, 245 F.3d at 1239.

With all four elements having been satisfied, the court concludes that Plaintiff has adequately alleged a prima facie case of disparate treatment in the terms and conditions of his employment.


**Relief**

Having determined Titan's liability, the court must next consider the amount of damages due to Plaintiff. In its motion for default judgment Plaintiff seeks a damages award against Defendant

in the total amount of $228,603.75 for the benefit of Brooks for pecuniary and nonpecuniary losses,[5] court costs, and any other appropriate relief. On the record before it, the court is satisfied a hearing would not aid it in determining the amount of damages in this case; thus a hearing is unnecessary. *See* Sec. & Exch. Comm'n, 420 F.3d at 1231, 1232 n.13.

With respect to his pecuniary losses, in his declaration dated July 3, 2013, Brooks states that while he was employed by Defendant he was paid on a per-day basis (doc. 73-1, ¶ 9). His daily rate was $145.00 for six days of work per week, or $870.00 per week (*id.*). After his employment was terminated, Brooks sought other full-time work. He accepted a job offer from Professional Facilities Management, Inc., for $7.25 per hour for an average work week of forty hours, earning $26,100.00 during his employment from December 2008 through August 2010, when the company lost its contract (*id.*, at 10). From September 2010 to February 2011, when he was laid off, Brooks earned $5,836.25 working for Servicemaster, again at an hourly rate of $7.25 but working only thirty-five hours per week (*id.*, at 11). Brooks sought other employment daily after being laid off by Servicemaster, but as of July 3, 2013, the date of his declaration, he had not worked or been offered work. Brooks states that he suffered total net lost wages in the amount of $178,603.75. This amount is based on a calculation of 242 weeks at $870.00 per week, or $210,540.00, less $31,936.25 for the amount he earned at Professional Facilities Management, Inc., and Servicemaster. Thus, on behalf of Brooks, Plaintiff seeks $178,603.75 in back pay (*id.*, at 16).

Back pay is an equitable remedy available to compensate an employee who has been discharged as a result of intentional employment discrimination. 42 U.S.C.2000e-5(g)(1). Back pay is "the difference between the actual wages earned and the wages the individual would have earned in the position that, but for the discrimination, the individual would have attained." Akouri v. State of Florida Dept. of Transp., 408 F.3d 1338, 1343 (11th Cir. 2005) (citation omitted). The court finds Brooks' statements in his declaration concerning his pecuniary damages to be credible. Although the requested amount is substantial, under the undisputed, well-pleaded facts it appears to be warranted. As a legitimate basis exists for the award of pecuniary damages in the amount of $178,603.75 in back pay, the court recommends that default judgment be entered in Plaintiff's favor

---

[5] Plaintiff makes no request for prejudgment interest.

in this amount on Brooks' behalf.  *See* <u>Anheuser Busch, Inc.</u>, 317 F.3d at 1266 (stating that court must "assure that there is a legitimate basis for any damage award it enters.").

With respect to his nonpecuniary losses, Brooks states in his July 3, 2013, declaration that as a result of the racial harassment he experienced while working at Titan and the termination of his employment, he has suffered mental and emotional anguish, for which $50,000.00 would reasonably compensate him (doc. 73-1 at 15).  As set forth above, in his supplemental declaration Brooks states that the racial comments, slurs, harassment, and other discriminatory conduct to which he was subjected made him feel "belittled," "dehumanized," "embarrassed," "less of a man," "depressed," "upset," "angry," and as if he were being "treated like a slave" (doc. 77-1).  Brooks also states that during his employment at Titan he often cried, worried about being fired, and felt nervous, stressed, and sad *(id.)*.

Under Title VII, non-economic compensatory damages are available to individuals subjected to intentional discrimination.  42 U.S.C. § 1981a; <u>Pollard v. E.I. du Pont de Nemours & Co.</u>, 532 U.S. 843, 852, 121 S. Ct. 1946, 150 L. Ed. 2d 62 (2001).  Section 1981a provides that compensatory damages may be awarded for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses."  42 U.S.C. § 1981 a(b)(3). Statutory limitations are imposed on the amount of compensatory damages recoverable for Title VII violations.  *See, e.g.*, 42 U.S.C. 1981a(b)(3)(A) (providing that "in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year" for each complaining party the amount awarded may not exceed $50,000). General compensatory damages (including damages for mental and emotional distress) "need not be proven with a high degree of specificity."  <u>Ferrill v. The Parker Group, Inc.</u>, 168 F.3d 468, 476 (11th Cir. 1999).  Such damages "may be inferred from the circumstances as well as proved by the testimony."  *Id.  See also* <u>Farley v. Nationwide Mutual Insurance Company</u>, 197 F.3d 1322, 1336 (11th Cir. 1999) (upholding award of $300,000 for emotional distress damages in Americans with Disabilities Act and Age Discrimination in Employment Act action for wrongful termination); <u>Bradshaw v. School Board of Broward County, Florida</u>, 486 F.3d 1205 (11th Cir. 2007) (upholding award of $300,000 for compensatory damages in sexual harassment case).

In this case, the court concludes that Brooks' statements, as set forth in his July 3, 2013, and August 6, 2013, declarations, are credible and, under the facts alleged, the amount of $50,000 sought is not unreasonable. As a legitimate basis exists for the award of nonpecuniary damages in this amount for emotional pain and mental anguish, the court recommends that default judgment be entered in Plaintiff's favor in the amount of $50,000, on Brooks' behalf.

Finally, Plaintiff requests an award of its court costs in this action. If the district court adopts this Report and Recommendation, and judgment is entered in Plaintiff's favor, as the prevailing party Plaintiff should be permitted to proceed on its demand for court costs, as provided in Fed. R. Civ. P. 54(d) and N.D. Fla. Loc. R. 54.2.

## V. CONCLUSION

For the foregoing reasons, the court recommends that Plaintiff's motion for default judgment (doc. 73) be granted and that judgment be entered in Plaintiff's favor in the total amount of $228,603.75, on behalf of Michael Brooks. The court further recommends that, if the district court adopts this Report and Recommendation and judgment is entered in Plaintiff's favor, that Plaintiff be awarded its court costs.

Accordingly, it is **ORDERED**:

Plaintiff's motion to stay the litigation (doc. 80) is **DENIED** as moot.

And it is respectfully **RECOMMENDED**:

1.      That Defendant Titan Waste Services, Inc.'s answer and affirmative defenses (doc. 10) be **STRICKEN**.

2.      That Plaintiff Equal Employment Opportunity Commission's motion for default judgment (doc. 73) be **GRANTED**.

3.      That the clerk enter judgment in favor of Plaintiff Equal Employment Opportunity Commission, on behalf of Michael Brooks, and against Defendant Titan Waste Services, Inc., in the total amount of $228,603.75.

4.      That Plaintiff Equal Employment Opportunity Commission be awarded its reasonable

court costs. If the district court adopts this Report and Recommendation, and default judgment is entered in Plaintiff's favor, Plaintiff should be permitted to proceed on its demand for court costs as provided in Fed. R. Civ. P. 54(d) and N.D. Fla. Loc. R. 54.2.

At Pensacola, Florida this <u>5</u><sup>th</sup> day of December 2013.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. <u>**Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.**</u> A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).